1

2

3

4

5

6

7                                UNITED STATES DISTRICT COURT

8                          FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   GAYLAND DURSTON JORDAN                    Case No.  1:20-cv-666-BAM
     STOLL, III, et al.,
11                                             **ORDER RE CROSS MOTIONS FOR**
                      Plaintiffs,              **SUMMARY JUDGMENT**
12
                                               (Doc. Nos. 14, 16)
13        v.

14   UNITED STATES CITIZENSHIP AND
     IMMIGRATION SERVICES, et al.,
15
                      Defendants.
16

17          Plaintiffs Gayland-Durston Jordan Stoll, III ("plaintiff-son") and Gayland Durston Stoll, II

18   ("plaintiff-father" and collectively "Plaintiffs") bring this civil action against Defendants Robert

19   M. Cowan, Director of United States Citizenship and Immigration Services ("USCIS"), Robert P.

20   Barr, Attorney general of the United States, Kenneth T. Cuccinelli, Senior Official Performing

21   Duties of Director of USCIS, Michael J. Creppy, Member of Board of Immigration Appeals, and

22   Gary D. Malphrus, Acting Chairman of Board of Immigration Appeals (collectively

23   "Defendants").  Plaintiffs seek judicial review of a denial of an I-130 petition by USCIS's

24   National Benefits Center and the U.S. Department of Justice's Board of Immigration Appeals

25   ("BIA").  Plaintiffs bring this action pursuant to § 10(b) of the Administrative Procedures Act

26   ("APA"), 5 U.S.C. § 702, et seq., seeking review of Defendant U.S. Citizenship and Immigration

27   Services' ("USCIS") decision, and the BIA's affirmance of that decision, denying Plaintiff-

28

                                                    1

father's petition to classify Plaintiff-son, the beneficiary, as an immediate relative child.  See 8

U.S.C. §1154(a)(1)(A)(i) (right to petition) and §1151(b)(2)(A)(i) (definition of "immediate

relative").The parties' cross-motions for summary judgment are now pending before the Court.[1]

(Doc. Nos. 14, 16.)

The motions were heard before the Honorable Barbara A. McAuliffe, United States

Magistrate Judge, on February 12, 2021.  Plaintiffs' Counsel Gregory W. Olson appeared by

video conference.  Defendants' Counsel Audrey Benison Hemesath appeared by video

conference.  Having considered the record, the parties' briefs and arguments, the relevant law, and

the entire record, the Court DENIES Plaintiffs' motion for summary judgment, and GRANTS

Defendants' motion for summary judgment.

**I.      BACKGROUND**

**A. Factual Background**

Plaintiff-father is a United States citizen who is married and lives with his family in

Porterville, California. In August 2000, Plaintiff-father and his wife met Plaintiff-son, Gayland-

Durston Jordan Stoll, III, whose birth name was Jordan Carrillo Cruz, when he was three years

old and living in Mexico with his biological parents. AR 100, 103.[2] When Plaintiff-father and his

wife met Plaintiff-son and his biological family, the child was suffering from various medical

conditions, his family was living in poverty, and his biological mother was pregnant with twins.

AR at 100. At the time Plaintiffs met, Plaintiff-son's biological parents were considering placing

plaintiff-son in an orphanage temporarily. AR 216. Plaintiff-father and his wife consulted the

United States Consulate in Mexico and the Mexican Department of Social Services to ensure that

their actions were appropriate. AR 100, 103.

Plaintiff-son entered the United States on November 4, 2000. AR 72. He was brought to

the United States by his biological father on visitor visas. AR 216. After observing the Stolls'

---

[1]  The parties have consented.to the jurisdiction of the United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c).  (Doc. Nos. 4, 12, and 15.)

[2] "AR" refers to the Administrative Record in this case which is found at Docket no. 22 in the Court's electronic docket.  All page references to the Administrative Record are to the electronic page number in the Court's electronic docket.

living situation, the biological father "knew it was the right decision" and left Plaintiff-son in the custody of the Stolls. AR 216. The biological mother, who could not travel due to pregnancy, left the Plaintiff-son a letter telling him to be a good "son" and that he was now a part of their family. AR 176.

Plaintiff-father and his wife obtained temporary guardianship over the child on July 17, 2001 and permanent guardianship on September 14, 2001. AR 178-80 and 112. Plaintiff-father enrolled Plaintiff-son in his health and dental insurance. AR 106-07.

In or around 2006, Plaintiff-son's biological mother asked Plaintiff-father's wife if she and Plaintiff-father wanted to adopt Plaintiff-son. AR 103. On July 10, 2009, Plaintiff-father and his wife adopted Plaintiff-son eight and a half years after Plaintiff-son's entry into the United States. AR 76-78.

On May 27, 2014, Plaintiff-father filed an I-130 Petition for Alien Relative with USCIS on behalf of Plaintiff-son. AR 72-73. On November 25, 2014, USCIS issued a Request for Evidence identifying that the Hague Convention[3] applied to adoptions finalized after April 1, 2008 and requesting additional evidence to support that the adoption was outside the convention. AR 261-66. On February 16, 2015, Plaintiffs responded to the first Request for Evidence with multiple affidavits, school records, medical records, legal documents from the adoption, and identity documents. AR 267-70. On June 28, 2016, USCIS issued a second request for Evidence identifying that the Hague convention appeared to apply to the adoption and requiring additional evidence in support of the petition. AR 126-133. On September 22, 2016, Plaintiff also responded to the second Request for Evidence with multiple affidavits, school records, letters from relevant parties, legal documents for the adoption and guardianship proceedings, and medical records. AR 134.

On January 31, 2017, USCIS issued a Notice of Denial to Plaintiffs' I-130 petition. AR 81-87. On March 3, 2017, Plaintiffs provided additional information after receiving the Notice of Intent to Deny including resubmitting evidence already submitted, additional affidavits and

---

[3] The Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption is discussed at length, *supra*.

letters, more evidence of medical care and the manner of travel to and from Mexico in 2000. AR 88-117.

The biological parents both submitted declarations during the pendency of the I-130 petition. Plaintiff-son's biological mother stated that she did not see a future for him in Mexico, and that she made the decision so that he would know the comfort of a warm home and never have to worry about food or medical attention. AR 213, 216. Plaintiff-son's biological father stated that the Stolls entering their lives was a blessing and that the Stolls offered to be Plaintiff-son's guardian. AR 227-28. Plaintiff-son stated in his affidavit in support of the I-130 petition, that his biological parents eventually distanced themselves for him to focus on his "present family." AR 227-28.

On April 18, 2017, USCIS issued a denial of Plaintiffs' I-130 petition on the grounds that Plaintiff-father failed to provide sufficient evidence that the adoption falls outside the scope of the Hague Convention. AR 20. On May 16, 2017, Plaintiffs appealed the April 18, 2017 denial of Plaintiffs' I-130 petition to the Board of Immigration Appeals. AR 10-11. On November 19, 2019, the BIA dismissed the appeal finding that "the record indicates that the reason the beneficiary moved from his native Mexico to the United States was to be in a familiar relationship with [Plaintiff-father] and his spouse, which tends to suggest that his move to the United States was 'for the purpose of' adoption." AR 5.

### B. Procedural History

Plaintiffs initiated this action on May 11, 2020. (Doc. 1.) On May 27, 2014, Plaintiff-father's I-130 petition was filed on behalf of plaintiff-son. In the instant action, Plaintiffs alleges the following claims: (1) APA violations by USCIS Defendants of 5 U.S.C. § 701, *et seq*; and (2) APA violations by BIA Defendants of 5 U.S.C. § 701, *et seq.*

Defendants now move for summary judgment on both of Plaintiffs' claims. (Doc. 14.) Plaintiffs opposed the motion, arguing that Defendants are not entitled to summary judgment on these claims. (Doc. 19.) No reply was filed.

Plaintiffs concurrently move for summary judgment on all of their claims. (Doc. 16.) Defendants opposed the motion. (Doc. 18.) No reply was filed.

## II.     LEGAL STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a court may set aside a final agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Following this narrow standard of review, a district court is not to replace its own judgment for that of the agency. *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009). The district court instead is to determine whether the decision was based on a consideration of the relevant facts. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1905 (2020). Under the APA, the Court's review is limited to the administrative record. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994). The reviewing court must ensure that the agency reviewed the relevant facts and satisfactorily articulated an explanation for its determination. *FCC,* 556 U.S. at 513. For a court to uphold an agency decision, it must find that the evidence presented before the agency "provided a reasonable and ample basis for its decision." *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture,* 18 F.3d 1468, 1471 (9th Cir. 1994). It is an abuse of discretion if the agency acts as if "there is no evidence to support the decision or if the decision was based on an improper understanding of the law." *Kazarian v. U.S. Citizenship and Immigration Services*, 596 F.3d 1115, 1118 (9th Cir. 2010) (internal citations omitted).

For purposes of the motions for summary judgment, the usual "genuine dispute of material fact" standard for summary judgment does not apply in an APA case. *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.,* 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011), citing *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir.1985). Since summary judgment is restricted to an administrative record, the district court's function is to determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co., v. INS,* 753 F.2d 766, 769 (9th Cir. 1985). The district court is not to resolve any disputed facts in review of an administrative proceeding, even if there where facts in dispute before the agency. *Occidental,* 753 F.2d at 766. In *Judulang v. Holder*, 565 U.S. 42, 63 (2011), an opinion considering the arbitrary and capricious nature of a Board of Immigration Appeals decision, Justice Kagan wrote, "[w]e must reverse an agency policy when

we cannot discern a reason for it."  The function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.  *See City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

### III.   ADOPTION LEGAL FRAMEWORK

#### A.  The Hague Convention and the Implementing Statutory Framework

"The Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (Hague Adoption Convention) is an international treaty that provides important safeguards to protect the best interests of children, birth parents, and adoptive parents who are involved in intercountry adoptions." https://www.uscis.gov/adoption/immigrationthrough-adoption/hague-process (last visited Feb. 26, 2021) (hereinafter "Hague Convention").  The purpose of the Hague Convention, as it relates to adoptions, is "to establish safeguards to ensure that intercountry adoptions take place in the best interests of the child and with respect for his or her fundamental rights as recognised in international law."  Hague Convention, Art. 1. The Hague Convention applies where:

> "a child habitually resident in one Contracting State ("the State of origin") has been, is being, or is to be moved to another Contracting State ("the receiving State") either after his or her adoption in the State of origin by spouses or a person habitually resident in the receiving State, or for the purposes of such an adoption in the receiving State or in the State of origin.

Hague Convention, Art. 2. The Convention proposes to establish "safeguards" and a "system of cooperation" and mutual "recognition" for intercountry adoptions—all with an eye towards preventing "the abduction, the sale of, or traffic in children." Hague Convention, art. 1, ¶ 1

The Hague Convention, however, is not self-executing.  "[T]he Convention creates obligations only for State Parties and 'does not by itself give rise to domestically enforceable federal law' absent 'implementing legislation passed by Congress.'" *Bond v. United States*, 572 U.S. 844, 851, 134 S.Ct. 2077, 2084, 189 L.Ed.2d 1 (2014) (plurality) (quoting *Medellin v. Texas*, 552 U.S. 491, 505 n. 2, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008)).

Thereafter, in 2000, Congress enacted the Intercountry Adoption Act of 2000, 42 U.S.C. §

14901 et seq., ("IAA") to implement the Hague Convention. The IAA's purpose is to:

> "protect the rights of, and prevent abuses against, children, birth families, and adoptive parents involved in adoptions (or prospective adoptions) subject to the Convention, and to ensure that such adoptions are in the children's best interests[,] and to improve the ability of the Federal Government to assist United States citizens seeking to adopt children from abroad and residents of other countries party to the Convention seeking to adopt children from the United States."

Id. §§ 14901(b)(2), (b)(3).

The IAA added a third definition of "child" to the Immigration and Nationality Act.[4] Tracking the language of article 2 of the Hague Convention, the IAA added a definition of "child" as a person younger than 16 years of age at the time a petition is filed on the child's behalf to accord a classification as an immediate relative under [ 8 U.S.C. § 1151(b)], who has been adopted in a foreign state that is a party to the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, ... or *who is emigrating* from such a foreign state *to be adopted* in the United States. 8 U.S.C. § 1101(b)(1)(G)(i) (emphasis added).

### B.  The Regulatory Framework Promulgated under the IAA

In 2007, USCIS promulgated an interim rule to implement the provisions of the IAA. *See* Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention, 72 Fed. Reg. 56,832 (Oct. 4, 2007) (codified at 8 C.F.R. pts. 103, 204, 213a, 299, and 322). The Hague Convention itself took effect on April 1, 2008. *See* Deposit of Instrument of Ratification by the United States of the Hague Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption, 72 Fed. Reg. 71,730 (Dec. 18,

---

[4] The Immigration and Nationality Act (INA") affords preferential immigration status to an alien who is an "immediate relative" of a United States citizen. See 8 U.S.C. § 1154(b). The INA allows a United States citizen to petition to confer citizen status as an immediate relative to his or her "child." See id. § 1154(a)(1)(A)(i) (right to petition); see also id. § 1151(b)(2)(A)(i) (definition of "immediate relative"). Immediate relative status is applied for via the filing of a Form I-130 Petition for Alien relative.  (Doc. 14, p. 3.)  Until 1999, the Immigration and Nationality Act contained only two definitions of "child" related to adopted children. First, section 101(b)(1)(E) defined "child" as a person "adopted while under the age of sixteen years if the child has been in legal custody of, and has resided with, the adopting parent or parents for at least two years." Id. § 1101(b)(1)(E)(i). Second, section 101(b)(1)(F) broadened the definition of "child" by eliminating the custody and residency requirement if the child qualified as an "orphan" under the Act. Id. § 1101(b)(1)(F)(i). *See generally*, *Fingerson v. Dep't of Homeland Sec.,* 198 F. Supp. 3d 786, 789–90 (W.D. Ky. 2016)  As stated above, the IAA added a third definition to give preferential immigration status to adopted children from a Hague Convention country.

2007).[5] The interim rule explains the relationship between the longstanding definition of child codified at 8 U.S.C. § 1101(b)(1)(E) and the new definition of child codified at 8 U.S.C. § 1101(b)(1)(G). *See* Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention, 72 Fed. Reg. at 56,832–35; *See generally, Fingerson v. Dep't of Homeland Sec*., 198 F. Supp. 3d 786, 791 (W.D. Ky. 2016).

The regulations define what is considered a Hague Convention adoption.  A Hague Convention adoption is one, on or after the Convention effective date, where the child, habitually resident in a convention country, will move, or has moved, from one Convention country to another for purposes of adoption.  8 C.F.R. § 204.303 ("Convention adoption.")  The section defining a Hague Convention adoption states:

> Convention adoption, … , means the adoption, on or after the Convention effective date, of an alien child habitually resident in a Convention country by a U.S. citizen habitually resident in the United States, when in connection with the adoption the child has moved, or will move, from the Convention country to the United States.

*Id.*

Under the regulations, the Hague Convention applies to domestic adoptions when the adoptee is a citizen of another country where the Hague Adoption Convention is also in force. The regulations state that if a child is a citizen of a Hague Convention country (other than the United States) (8 C.F.R. § 204.301,) and is present in the United States for adoption, the child should generally be deemed to be habitually resident in the child's country of citizenship, even though the child is already in the United States. 8 C.F.R. § 204.303(b) (Habitual residence).[6]  A

---

[5] The United States signed the Convention on March 31, 1994 and the President transmitted it to the Senate for its advice and consent on June 11, 1998. (S. Treaty Doc. 105-51 at III (1998)). On September 20, 2000, the Senate gave its advice and consent to the ratification of the Convention, subject to certain declarations, and on October 6, 2000, Congress enacted the implementing legislation for the Convention, the Intercountry Adoption Act of 2000, Public Law 106-279, 42 U.S.C. 14901-14952 (the IAA). The President signed the instrument of ratification on November 16, 2007. Deposit of Instrument of Ratification by the United States of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, 72 FR 71730-03.

[6] 8 C.F.R. § 204.303(b) Habitual residence:
(b) Convention adoptees. A child whose classification is sought as a Convention adoptee is, generally, deemed for purposes of this subpart C [Intercountry Adoption of a Convention Adoptee] to *be habitually resident in the country of the child's citizenship*. .. . . .  The child will

8

child is habitually resident in the county of the child's citizenship.  Thus, even if a child is present in the United States, the child is habitually resident in the county of the child's citizenship.

It is no longer possible to obtain a domestic adoption for a child whose country of citizenship is a Convention country, and then, seek to comply with immigration regulations for the adoption thereafter.  If a child present in the United States is adopted on or after the Hague Convention date, but is a habitual resident (i.e., citizen) of a Convention county, the USCIS will not approve an I-130 form.  See 8 C.F.R. § 204.2(d)(2)(vii)(F).  This section provides:

> For purposes of paragraph (d)(2)(vii)(D) of this section, USCIS will not approve a Form I–130 under section 101(b)(1)(E) of the Act on behalf of an alien child who is present in the United States based on an adoption that is entered on or after the Convention effective date, but whose habitual residence immediately before the child's arrival in the United States was in a Convention country. However, the U.S. citizen seeking the child's adoption may file a Form I–800A and Form I–800 under 8 CFR part 204, subpart C.

8 C.F.R. § 204.2(d)(2)(vii)(F).  Thus, the regulations would not, and did not in this case, permit the USCIS to approve Plaintiff-father's I-130 form.

## IV.    DISCUSSION AND ANALYSIS

### A.  Whether the Hague Convention Applies

A major dispute in this case is whether the Hague Convention applies to the Plaintiff-father/Plaintiff-son adoption. Plaintiff contends that the BIA should not have applied the Hague Convention to Plaintiff-son because Plaintiff-son entered the United States before the effective date of April 1, 2008.  (See Motion, Doc. 17, p. 13.)  Plaintiffs argue that the Hague Convention is not designed to apply to people who are already living in the United States and that any "intent" at the time the child came into the United States is not in the language of the statute and not in the language of the immigration regulations. The government argues that Plaintiff-son's adoption fell within the scope of the Hague Convention.

---

not be considered to be habitually resident in any country to which the child travels temporarily, or to which he or she travels either as a prelude to, or in conjunction with, his or her adoption and/or immigration to the United States. (emphasis added).

It is undisputed that the adoption of Plaintiff-son occurred after the effective date of the Hague Convention. The Hague Convention became effective on April 1, 2008. See 8 C.F.R. §204.301 (definition of "effective date"). Plaintiff-son's adoption occurred on July 10, 2009. The Hague Adoption Convention applies to domestic adoptions when the adoptee is a citizen of another country where the Hague Convention is also in force. Both the United States and Mexico are signatories to the Hague Convention. At the time of the adoption, it is undisputed that Plaintiff-father was a citizen of the United States and that Plaintiff-son was a citizen of Mexico.

At issue in this case is the Plaintiff-father's challenge to the term "habitually resident," contained in the regulations; that the BIA found Plaintiff-son was a habitual resident of Mexico when in fact Plaintiff-son had been in the United States for some nine (9) years before the adoption. As Plaintiffs argue, Plaintiff-son should have been found to be habitually resident of the United States. Plaintiff argues that the Hague Convention does not apply where both the adoptive parents and the adoptive child are residents of the same country.

Neither the Hague Convention itself nor its implementing legislation, the IAA, offers a definition of "habitual resident" for purposes of intercountry adoptions. The Code of Federal Regulations, however, provides a definition of "habitual residence" of the child. The regulations define "habitual residence" as the child's country of citizenship. See 8 C.F.R. § 204.303(b) states:

> (b) Convention adoptees. A child whose classification is sought as a Convention adoptee is, generally, deemed for purposes of this subpart C [Intercountry Adoption of a Convention Adoptee] to be habitually resident in the *country of the child's citizenship*. .. . . . The child will not be considered to be habitually resident in any country to which the child travels temporarily, or to which he or she travels either as a prelude to, or in conjunction with, his or her adoption and/or immigration to the United States.

8 C.F.R. § 204.303(b) (Habitual residence) (emphasis added).

The child's "habitual residence" under the Hague Convention's implementing regulations is defined as the child's country of citizenship; it is not the child's country of domicile.[7] If the

---

[7] There is an exception to the country of citizenship for purposes of "habitual residence," which is not relevant in this case. The child will be deemed habitually resident in that other country, rather than in the country of citizenship where the Central Authority of the sending country determines that the child's status in the receiving country is sufficiently stable for it to exercise jurisdiction; the child may be considered "habitually resident" in the receiving country. See 8 C.F.R.

prospective adoptive parents are considered "habitual residents" of the United States, and the child is considered a "habitual resident" of a different Convention country (i.e., citizen), and the child will be moving, or has moved, from one Convention country to another for purposes of adoption, the Hague Adoption Convention governs the adoption.[8] Thus, the term "habitually resident" for purposes of the Hague Convention adoptions in the United States focuses on country of citizenship. See generally 8 C.F.R. § 204.303(b).

For purposes of Plaintiff-father's challenge to the denial of the 1-130 Form, the regulations state that an I-130 will not be approved and that the Hague Convention applies even when the child to be adopted is present in the U.S. and is being adopted by prospective adoptive parents also present in the United States.  8 CFR § 204.2(d)(2)(vii)(D) and (F).

Based on the facts of this case, the Hague Convention would apply.  The Hague Convention became effective on April 1, 2008 before Plaintiff-son's adoption on July 10, 2009. The regulations define that the child is habitually resident of the country of citizenship and not of the child's domicile. Plaintiff-son's country of citizenship was Mexico and Plaintiff-father was a citizen of the United States.  Therefore, the Hague Convention would generally apply.

The Court now turns to Plaintiffs' specific arguments to determine whether this case is taken outside of the Hague Convention.

B. **Plaintiffs' Claim that the regulations promulgated by USCIS exceed their Grant of Authority**

Plaintiff claims that the USCIS regulations defining habitual residence are impermissible agency action, expanding the scope of the Hague Convention and the IAA.  Plaintiff-father argues

---

§204.303(b). If an affirmative ruling from the Central Authority of the child's country of citizenship is obtained, a child is no longer a habitual resident of the country of citizenship and instead is a habitual resident of the United States where the child is domiciled.  From the Court's review of secondary authority, it appears that Mexico, as a regular practice, does not make any such affirmative ruling. Karen Stoutamyer Law, Dan Berger, Massiell Tercero-Parker, and Emily Ferron, *Intercountry Adoption, Domestic Adoption and the Post-Hague Landscape*, AILA Immigration Practice Pointers (2012

[8] "Convention adoptee" means a child habitually resident in a Convention country who is eligible to immigrate to the United States on the basis of a Convention adoption.  8 C.F.R. § 204.301.

that the "habitual residence" of Plaintiff-son should have been determined to be the United States because Plaintiff-son had been living in the United States since the year 2000.

Here, Plaintiff challenges the validity of the regulations. When a court determines if an agency's regulation is valid, the court applies the two-step *Chevron* analysis. *Chevron U.S.A. . v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). Following the two-step approach of the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., the Court must first determine whether Congress has directly spoken to the precise question at issue. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1054 (9th Cir. 2010). If the statute is silent or ambiguous with respect to the specific issue, the Court must then determine whether the agency's answer is based on a permissible construction of the statute. *Id.* "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id*.

Plaintiffs argue that Congress has not spoken on the issue of habitual residence as there is no such "habitual residence" requirement in connection with convention adoptions stated in the IAA. Plaintiff argues that the IAA statutory definition does not include "habitual resident."

This Court agrees with Plaintiff in the first step of the *Chevron* analysis. The IAA does not include language or definition of "habitual resident" of a convention adoption, or anywhere else in the Act. See 42 U.S.C.A. § 14902(10) ("The term "Convention adoption" means an adoption of *a child resident* in a foreign country party to the Convention by a United States citizen, or an adoption of a child resident in the United States by an individual residing in another Convention country.") (emphasis added.) Therefore, the statute is silent or ambiguous on habitual residence, and Congress has not spoken of the issue of habitual residence.

Turning to the second step of *Chevron*, the Court must then determine whether the agency's answer is based on a permissible construction of the statute. Plaintiffs allege that USCIS' regulation impermissibly expanded the definitions of "convention adoption" and "child," by adding the habitual resident requirement and the "has moved" language to the definition of a

child.[9]  Plaintiff claims that the IAA (42 U.S.C. §14902(10)) gives a clear definition of what a "convention adoption" is, which does not include the words "habitual residence."  (See Motion at Doc. 17, p.18.)

The Court finds that implementing regulations are based on a permissible construction of the statute.  While the IAA does not include the term "habitual residence" or provide a definition of habitual residence, the regulations are not in conflict with the Convention and intent of Congress. The Hague Convention, itself, uses the language of "habitual resident" and the language "has moved" in its classification of a Convention adoption.[10] The regulations provide continuity and consistency with the Convention, where the IAA fails to explicitly define the terms.

The regulations provide permissible definitions for implementing the Hague Convention under the IAA.  *Northwest Ecosystem Alliance v. United States Fish and Wildlife Service*, 475 F.3d 1136, 1141 (9th Cir.2007). "Under *Chevron*'s classic formulation, if ... there is an express delegation of authority [by Congress] to the agency to elucidate a specific provision of the statute by regulation, [then] [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id.*  Here, the IAA expressly delegated authority to the Secretary, along with the Attorney General, to promulgate regulations. 42 U.S.C. §14941(a)(1) ("the Secretary, in consultation with the Attorney General, shall issue regulations that establish procedures and requirements in accordance with the Convention . . .") The Court gives controlling weight to the regulations defining habitual residence because of the

---

[9] See 8 C.F.R. § 204.301 defining, "Convention adoption" as: "Convention adoption, . . . means the adoption, on or after the Convention effective date, of an alien child *habitually resident* in a Convention country by a U.S. citizen habitually resident in the United States, when in connection with the adoption the child *has moved, or will move*, from the Convention country to the United States." (emphasis added.)  This phrase "habitually resident" is used throughout the implementing regulations.

[10] See Hague Convention, art 2 ¶ 1 (emphasis added):
"where a child *habitually resident* in one Contracting State ("the State of origin") *has been, is being, or is to be moved* to another Contracting State ("the receiving State") either after his or her adoption in the State of origin by spouses of a person habitually resident in the receiving State, or for the purposes of such an adoption in the receiving State or in the State of origin."

13

express delegation of authority by Congress to promulgate regulations to further the requirements of the Convention. "*Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv*., 475 F.3d 1136, 1141 (9th Cir. 2007).

The regulations are also not contrary to the intent of Congress. The regulations are consistent with the findings and purposes of the IAA. Congress found that there was a need for "uniform interpretation and implementation of the Convention in the United States and abroad," and "to protect the rights of . . ., children, birth families, and adoptive parents involved in adoptions (or prospective adoptions) subject to the Convention, and to ensure that such adoptions are in the children's best interests."  42 U.S.C. §14901(a)(1) and (b)(2). The habitual residency requirement, and the USCIS regulations defining that requirement, provide consistency in intercountry adoptions by looking at the child's citizenship rather than the child's physical location. The regulations provide a reasonable definition of how a child's residence is classified consistent with the intent of Congress. Defining "habitual residence" as the citizenship of the child ensures that contracting parties to the Hague Convention, both the country of origin and receiving country, will have input into intercountry adoptions. *See* e.g., *Fingerson v. Dep't of Homeland Sec.,* 198 F. Supp. 3d 786, 793 (W.D. Ky. 2016) (USCIS's regulations, including 8 C.F.R. § 204.2(d)(2)(vii), promote Congress's goals in at least two ways. First, such an approach avoids the potential foreign relations consequences if a citizen were to adopt a foreign national temporarily in the United States without the country of origin's consent. Second, USCIS's interpretation encourages uniform application and guards against possible avoidance of the Convention's safeguards by looking to the child's citizenship rather than to the happenstance of child's temporary location.)  Therefore, the Court finds that the regulations are not outside the statutory framework or against the intent of Congress.

C. **Plaintiffs' Claim that the Hague Convention Should not Apply Because Plaintiff-son entered the United States Prior to the Convention Effective Date**

Plaintiffs argue that the regulations impermissibly apply the Hague Convention

14

retroactively to children who entered the United States prior to the effective date in compliance with then-applicable laws, but were adopted after the effective date. (Motion, Doc. 17, p. 13.) Defendants argue that the date of adoption is controlling, not the date the child entered the United States. Defendants further argue that the regulations do not focus on the child's location in determining if the Convention applies, but rather focus on the child's citizenship. As Defendants argue, the facts that determine applicability of the Convention to an adoption include: (1) that the adopting parent is a United States Citizen, (2) that the child adoptee is "habitually resident" in a Convention country, and (3) the adoption was finalized after the Convention took effect.

Defendants' argument is persuasive. Having determined that the USCIS regulations involving the "habitual resident" and "has moved" language are valid regulations; those regulations apply to this case. The Stolls are United States citizens, Plaintiff-son is a citizen of Mexico and is deemed habitually resident (i.e, citizen) there.  Plaintiff-son's adoption was finalized after the Hague Convention effective date. The effective date of the Convention was April 1, 2008, and the adoption was finalized on July 10, 2009. (AR 76-77.) Under these facts, there is no retroactive application of the Hague Convention or the regulations in this case. The regulations apply to all adoptions entered into after the effective date of the Hague Convention regardless of the child's physical location. Where an agency promulgates a regulation filling in a gap in a statute it enforces, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. at 844.

Plaintiff-son argues that the Hague Convention is retroactive to him because he entered the United States prior to the effective date of the Hague Convention, and in compliance with applicable law at that time.  (Motion, Doc. 17, p. 13.) Plaintiffs argue that the statutory provisions establishing the Secretary's general rulemaking power contain no express authorization of retroactive rulemaking, citing *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 213, 109 S. Ct. 468, 474, 102 L. Ed. 2d 493 (1988). In *Bowen,* however, the express language in the regulation sought to apply the regulation retroactively to a time before Congress had changed the statute. The result was an application of the regulation which negated Congress' action, against the

1    express legislative history forbidding such retroactivity.  *Bowen*, 488 U.S. 207 and 214.

2         No such express retroactive language, as in *Bowen*, exists in Plaintiffs' case.  No

3    regulation says that the Hague Convention has retroactive effect on any adoption prior to the

4    effective date.  In fact, the regulations are explicit that they apply to adoptions "on or after the

5    Convention effective date."  See 8 C.F.R § 204.301 (convention adoption; apply "on or after the

6    Convention effective date."); 8 C.F.R. § 204.2(d)(2)(vii)(D) (child is habitually resident in

7    country of citizenship unless "the adoption was completed before the Convention effective date");

8    8 C.F.R. § 204.2(d)(2)(vii)(F) ("based on an adoption that is entered on or after the Convention

9    effective date").

10        The regulations apply to adoptions after April 1, 2008, the effective date of the Hague

11   Convention.  Plaintiff-son was adopted after April 1, 2008 and was adopted on July 10, 2009.

12   The application of a Hague Convention regulations to an adoption, post effective date of the

13   Hague Convention, is not a retroactive application of the regulations.  The Court agrees with the

14   government that "it does not matter that [Plaintiff-son] entered the United States before the treaty

15   effective date."  (Opposition, Doc. 18, p.5.) Whatever "rights" Plaintiff-son had when he entered

16   the country were mooted by implementation of the Hague Convention and the promulgation of

17   the Hague Convention regulations. There is no argument by Plaintiffs, and the Court is not cited

18   to any authority, that Plaintiff-son had any vested rights to be adopted outside of the regulations

19   implementing the Hague Convention by his mere presence in the United States, even though his

20   presence was lengthy. The Court is not aware of any authority that Plaintiff-son had a vested right

21   to be adopted in 2009 under the then-laws in effect at the time he entered the United States in

22   2000.

23        **D.  The BIA's Review of Plaintiff's Petition**

24             **1.  The Court Reviews the BIA Decision and not the USCIS Decision**

25        Plaintiffs in their first cause of action challenge the 2017 decision by USCIS—the

26   decision that was eventually appealed administratively to the BIA. (Complaint, Doc. 1, ¶¶ 37-

27   42.) The BIA's review of the USCIS decision was de novo. AR 1-22 p. 1 ("We review all

28   questions arising in appeals from decisions of the [USCIS] officers de novo.") The BIA's

1   decision does not indicate that the BIA adopted or incorporated the USCIS decision. AR 1-22.

2   Therefore, this Court reviews the decision of the BIA, not the underlying USCIS decision. *See*

3   *generally*, *Salazar-Paucar v. I.N.S.*, 281 F.3d 1069, 1073 (9th Cir. 2002) (When the "BIA

4   conducts a de novo review of the IJ's [Immigration Judge] decision," the district court reviews

5   "the BIA's decision rather than the IJ's, except to the extent that the BIA expressly adopts the IJ's

6   ruling.") amended by 290 F.3d 964 (9th Cir. 2002); *Alaelua v. I.N.S.,* 45 F.3d 1379, 1382 (9th

7   Cir. 1995) (reviewing both the BIA and Immigration Judge's decisions when it is clear that the

8   BIA decision "clearly incorporates" the Immigration Judge's decision). Thus, the Court reviews

9   the decision of the BIA and not that of the USCIS.

10                         **2.   Summary of the BIA Opinion**

11         On November 19, 2019, the BIA found that the Plaintiff-father "did not submit sufficient

12   evidence to establish that the beneficiary's adoption falls outside the scope of the Hague

13   Convention." AR 3. The BIA found that under the Regulations governing petitions filed on behalf

14   of an adopted child state that a Form 1-130 may not be filed for a child adopted after the Hauge

15   Convention effective date of April 1, 2008, if the child was habitually resident in a convention

16   country. AR 3-4.  A child present in the United States is generally considered to remain a habitual

17   resident of the country of citizenship, citing 8 CFR 204.303(b).  Since the adoption was finalized

18   after April 1, 2008 (Hague Convention effective date in U.S.), the Hague Convention applies.

19   Plaintiff-father did not demonstrate that "at the time of the [plaintiff-son] entered the United

20   States, the purpose of the entry was for reasons other than adoption," citing USCIS Policy

21   Memorandum, 'Criteria for Determining Habitual Residence in the United States for Children

22   from Hague Convention Countries." AR 4; (Doc. 14-1 (USCIS Policy Memorandum)).

23         The BIA found that Plaintiff-father did not establish that at the time the Plaintiff-son

24   entered the United States, the purpose of the entry was for reasons other than adoption.[11]  The

25   BIA evaluated the evidence submitted and found that the "evidence in the record indicates that

26   the reason the beneficiary moved from his native Mexico to the United States was to be in a

27   _____

28   [11] Stated another way, the purpose of plaintiff son coming to the United States was for adoption.

                                            17

familiar relationship with the [Plaintiff-father] and his spouse which tends to suggest that his move to the United States was 'for the purposes of' adoption.'" AR 5 (footnote omitted.)  The BIA affirmed the USCIS decision denying the I-130 petition because Plaintiff-father "did not establish that at the time the [Plaintiff-son] entered the United States, the purpose of the entry was for reasons other than adoption, and as such the [ Hague] Convention applies." AR 5.  The BIA affirmed the USCIS's denial of the I-130 petition.

### 3.  USCIS Policy Memorandum - Intent to Adopt – and Deference

In response to the Court's questions at oral argument as to the source of "intent to adopt" language (or as the BIA states "for purposes of" adoption) used by the BIA in its decision, and where was this language in the implementing regulations, both parties identified the USCIS' Policy Memorandum of November 20, 2017 as the source of the "intent to adopt" language relied upon by the BIA.  (Policy Memo at Doc. 14-1.)

The USCIS Policy Memorandum, Criteria for Determining Habitual Residence in the United States for Children from Hague Convention Countries ("Policy Memo") adopted prior guidance and "clarifies the applicable time frames and what evidence can satisfy the intent, residence and notice criteria."  (*See* Policy Memo at Doc. 14-1.) The "scope" of the Policy Memo "applies to and binds all USCIS employees adjudicating an immediate relative petition filed for an adopted child from a Hague Convention county *who is physically present* in the United States." (Doc. 14-1, p.2) (emphasis added.) The Policy Memo states that child is generally deemed to be habitually resident in a Hague Adoption Convention country if the child is a citizen of that Convention country. A child's country of citizenship is usually the child's country of origin (COO).  (Doc. 14-1, p.2.)  According to the Policy Memo, "USCIS is a competent authority that can make a factual determination of habitual residence when a child is present in the United States."  (Doc. 14-1, p.3.)  USCIS may determine a child living in the United States is habitually resident in the United States, and if such determination is made, the Hague Convention does not apply.  (Doc. 14-1, p. 3.)  As pertinent to this case, the Policy Memo provides that USCIS may approve a Form 1-130 if "at the time the child entered the United States, the purpose(s) of the entry were for reasons other than adoption (*intent criteria*)."  (Doc. 14-1, p. 4)

18

(emphasis in original). The Policy Memo criteria explicitly provides the test of intention. "USCIS will review the case to determine whether the child entered the U.S. for adoption purposes." (Doc. 14-1, p. 7.) The Policy Memo provides a multi-bullet point list of "Evidence of Intent Criteria" and evidence USCIS will consider to determine whether the child entered the U.S. for purposes of adoption, such as: the child's schooling, reason for travel to U.S., adoptive parents, contacts with child, timeline and events which led to child's availability for adoption, birth parents' ability to care of child, and declaration of adoptive parents intent. (Doc. 14-1 p.7.) The petitioning adoptive parents must submit with Form I-130 an affidavit describing the child's circumstances prior to entry to the U.S., a list of the individuals who cared for the child since the time of entry and their relationship to the child, a description of any contact that the adoptive parents had with the child. The adoptive parents must also declare that on the date of the child's U.S. entry, they "did not intend to adopt the child or circumvent the Hague Adoption Convention procedures." (Doc. 14-1, p. 8.)

In *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Service*, 629 F.3d 1024 (9th Cir. 2010), the Ninth Circuit stated that policy statements are not entitled to *Chevron* deference. "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Wilderness Watch, Inc*, 629 F.3d at 1034. "Such views, ... even if not authoritative for purposes of *Chevron*, are entitled to so-called *Skidmore* deference insofar as they 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Id.* (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). *Chevron* did not eliminate *Skidmore* 's holding that an agency's interpretation may merit some deference whatever its form, given the "specialized experience and broader investigations and information" available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires. *United States v. Mead Corp*., 533 U.S. 218, 234–35, 121 S. Ct. 2164, 2175, 150 L. Ed. 2d 292 (2001); *see generally Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 136, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (reasonable agency interpretations carry "at least some added

persuasive force" where *Chevron* is inapplicable); *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (according "some deference" to an interpretive rule that "do[es] not require notice and comment"); *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of ... delegated lawmaking powers").

Both parties cite to the Policy Memo as "binding" authority for purposes of determining "intent."  Yet, the Court finds that the Policy Memo does not constitute binding authority because it is a policy statement. It is not entitled to *Chevron* deference. The Court therefore applies *Skidmore* deference. Under that standard, "the deference to be accorded ... depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *Wilderness Soc'y,* 353 F.3d at 1060 (quoting *Mead*, 533 U.S. at 228, 121 S.Ct. 2164).

In the absence of any judicial or administrative guidance as to how to approach the question presented in this case, the Policy Memo presents a useful legal standard for resolving the instant controversy.  Specifically, the Policy Memo frames the question of how to determine if a child is "habitually resident" in the United States for purposes of the Hague Convention, when the child has been residing in the United States.  Employing a legal standard focused on a case-by-case factual evaluation of the circumstances surrounding a child's entry and residence in the United States is entirely consistent with the purpose underpinning Hague Convention.  *See also Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (a child's habitual residence depends on the totality of the circumstances specific to the case).

### 4.  Plaintiffs' Claim that the BIA used an Incorrect Standard of Review

Plaintiffs challenge the BIA's decision arguing that the BIA used a standard of proof higher than that of a preponderance of the evidence. (Doc. 17 at 10; Doc. 19 at 8.)  Plaintiffs contend that they established by substantial evidence that Plaintiff-son's purpose for entering the United States was not for adoption.

1        The parties do not dispute that the BIA reviews the Plaintiffs' petition under a

2    preponderance of the evidence standard. Both parties cite *Matter of Chawathe,* 25 I & N Dec. 369

3    (B.I.A. Oct. 20, 2010) for the proposition that preponderance of the evidence standard applies for

4    review by the BIA.

5        In challenging that the BIA used a higher standard of proof, Plaintiffs' complaint refers to

6    two phrases used by the BIA: (1) ". . . the record evidence tends to suggest an intention to adopt

7    the beneficiary" (Doc. 1, ¶¶45, 48; AR 1-22 p. 2); and (2) ". . . which tends to suggest that his

8    move to the United States was 'for the purposes of' adoption." (Doc. 1, ¶¶45, 48; AR 1-22 p. 3).

9    Plaintiffs argue that the "tends to suggest" language indicates a burden of proof higher than that

10   of preponderance of the evidence. (Doc. 1, ¶ ¶45, 48.)

11       This Court's review of the legal question of whether the BIA applied an incorrect standard

12   of review adjudicating an I-130 petition (thereby acting "not in accordance with law") is de novo.

13   *Zerezghi v. United States Citizenship & Immigration Servs.,* 955 F.3d 802, 807 (9th Cir. 2020).

14       Here, the BIA decision does not specifically identify the standard of review it was

15   employing. The BIA decision does not explicitly state that BIA is reviewing the petition under the

16   preponderance of the evidence standard (or under any other standard for that matter.)  Rather,

17   BIA completed a de novo review of the record and identified the records and evidence it had

18   reviewed and used the terminology that the evidence "tends to suggest" that entry was for

19   purposes of adoption. AR 3. While the decision is not as articulate as it could be, the BIA is

20   entitled to the presumption of regularity unless Plaintiffs can provide clear evidence to the

21   contrary. The presumption is the BIA knew it was required to use the preponderance of the

22   evidence standard of review.  Agency officials are entitled to a presumption that they discharged

23   their official duties properly and according to the law. *FCC v. Schreiber*, 381 U.S. 279, 296

24   (1965). Without a showing of clear evidence that the official did not act properly or according to

25   the law, Courts will apply the presumption of regularity. *United States v. Chem. Foundation, Inc*.,

26   272 U.S. 1, 14-15 (1926); *Kolhi v. Gonzalez*, 473 F.3d 1061, 1068 (9th Cir. 2007).

27       Plaintiffs have not provided any evidence, other than the word choice of "tends to

28   suggest," to support that the BIA used an incorrect standard of proof.  In the context of the BIA's

1   decision, the words "tend to suggest" mean "what the evidence shows:" (1) "we agree with the

2   Director that the [Plaintiff-father] did not establish that at the time the [Plaintiff-son] entered the

3   United states, the purpose of the entry was for a reason other than adoption.  Although the

4   [Plaintiff-father] did not adopt the beneficiary until almost 9 years after the [Plaintiff-son's]

5   arrival to the United States, the record evidence *tends to suggest* an intention to adopt the

6   [Plaintiff-son]," AR 4 (emphasis added); and (2) that "the record indicates that the reason the

7   beneficiary moved from his native Mexico to the United States was to be in a familiar

8   relationship with [Plaintiff-father] and his spouse, which *tends to suggest* that his move to the

9   United States was 'for the purpose of' adoption." AR 5 (emphasis added).  This language does

10  not establish a standard higher than preponderance of the evidence.  It certainly does not show a

11  higher standard, such as probable cause or clear and convincing.  In context, "tends to suggest"

12  means the evidence is more likely than not, which is consistent with the preponderance standard.

13         Regardless of whether the BIA explicitly states that it used the preponderance of the

14  evidence standard in its decision, the Court will not overturn the BIA holding if it is based on the

15  relevant facts, and the evidence in the record provided a reasonable and ample basis for the

16  decision.  Plaintiff's basic argument is, not that a higher standard of proof was used, but that the

17  weight of the evidence, if properly evaluated, would have resulted in a favorable decision to

18  Plaintiffs.  The Court now turns to that evaluation.

19                      **5.   BIA's Evaluation of the Evidence**

20         The Court now turns to the crux of Plaintiffs' arguments that Plaintiffs provided

21  overwhelming evidence to support the I-130 petition. Plaintiff argues that the BIA cherry picked

22  evidence and did not consider the totality of the evidence, but instead relied upon the biological

23  mother's letter to infer intent upon Plaintiff-father. (*See* Motion, Doc.17, p.10-12.)  Plaintiffs

24  argue that the bulk of their evidence was arbitrarily weighed against the single letter written by

25  the biological mother to her then 3-year old son.  (*Id*., Doc. 17, 11-13.) Plaintiffs also argue that

26  the agency misinterpreted the biological parents' consideration of placing Plaintiff-son in an

27  orphanage. Plaintiffs argue that the BIA ignored that the biological parents were considering it as

28  a temporary solution, which is consistent with the biological father's declarations. AR 216.

This Court will not overturn an agency determination unless it is arbitrary, capricious, or an abuse of discretion. *FCC,* 556 U.S. at 513. An agency does not violate the arbitrary and capricious standard where it articulates "a rational relationship between its factual findings and its decision." *Fence Creek Cattle Co. v. U.S. Forest Serv.,* 602 F.3d 1125, 1132 (9th Cir. 2010). "The agency's factual findings are reviewed for substantial evidence." *Family Inc. v. USCIS*, 469 F.3d 1313, 1315 (9th Cir. 2006) (citation omitted); *Bear Lake Watch, Inc., v. FERC*, 324 F.3d 1071, 1076 (9th Cir. 2003) (Agency factual determinations cannot be set aside by a district court if they are supported by substantial evidence). Courts should not "disturb the agency's findings under this deferential standard 'unless the evidence presented would compel a reasonable finder of fact to reach a contrary result.' " *Family Inc.*, 469 F.3d at 1315 (citation omitted). Substantial evidence is more than a mere scintilla, it is such evidence that a reasonable mind might accept as adequate to support the conclusion. *Bear Lake Watch, Inc*., 324 F.3d at 1076.

The BIA considered the totality of the evidence.  The BIA's decision discusses five main pieces of evidence in favor of its holding: (1) that Plaintiff-son was living with his biological parents prior to moving to the United States, (2) his biological parents were considering giving him up to an orphanage due to their inability to care for the child financially, (3) the biological mother's letter, (4) Plaintiff-father obtained guardianship in 2001 and added Plaintiff-son to his health and dental insurance, and (5) Plaintiff-son's affidavit stating that his biological family began to distance themselves so he could focus on his "present family." AR 5. Plaintiffs, however, argue that the same evidence supports a contrary finding, that the purpose of Plaintiff-son entering the United States was not for adoption.

Plaintiffs' interpretation is but one interpretation of the evidence.  Here, the BIA interpreted the evidence differently.  If the evidence is susceptible to more than one rational interpretation, the agency findings must be upheld. *Eichler v. SEC*, 757 F.2d 1066, 1069 (9th Cir. 1985). The standard is "extremely deferential" and a reviewing court must uphold the agency's findings "unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Monjaraz–Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003), amended by 339 F.3d 1012 (9th Cir.2003).

23

1    The BIA reviewed all of the records and evidence submitted.  AR 3 ("We have reviewed

2    the entire record of proceedings.")  The BIA summarized the evidence it considered pertinent to

3    the issue of whether Plaintiff-son entered the United States for purposes of adoption, including

4    the child's living situation in Mexico, the biological mother's parting letter with her son, the

5    child's living situation in the United States, the child's view of his relationship with the Plaintiff-

6    father contrasted with the biological parents.  AR 4-5.  The Court cannot find that the evidence

7    would compel a reasonable finder of fact to reach a contrary result.  Said another way, there is

8    substantial evidence to support the conclusion that the BIA reached.

9    Plaintiffs argue that the letter from the biological mother was misinterpreted and given

10   undue weight. The letter tells the Plaintiff-son to be a good son and that he is now a part of the

11   Stoll family. AR 176.  Plaintiffs argue that the choice of words had more to do with the age of the

12   child then the actual intentions of the biological mother. However, the BIA's interpretation that

13   the biological mother was giving Plaintiff-son up to another family is a rational interpretation.

14   Looking directly at the language, the biological mother makes several statements like "be a good

15   son" and "part of their family" that appear to be her giving the child up to the Stolls permanently.

16   It also supports that the Stolls were to act as parents to Plaintiff-son.

17   Plaintiffs also argue that the steps they took after Plaintiff-son entered the United States

18   would not suggest that they intended to adopt him. Plaintiffs reason that the guardianship and

19   placing the child on their health insurance was to facilitate his education and medical care. The

20   BIA, however, interpreted the same evidence as leading to adoption, as the Stolls "essentially

21   raised the [child]." AR 5. Again, the BIA's interpretation is rational. Plaintiff-father and his wife

22   raised the child from age three to the present. In his affidavit, Plaintiff-son states that he considers

23   the Stolls his family. AR 5. Based on an objective examination of the evidence, the Plaintiffs

24   actions could not only be facilitating the child's care in the short term, but also steps to adoption.

25   The Court does not find that the evidence would compel a reasonable finder of fact to reach a

26   contrary result.

27   Plaintiffs additionally argue that the declarations of Plaintiff-father and Ms. Stoll say that

28   their intention was not to adopt Plaintiff-son when he entered the United States. Defendants

contend that the declarations are self-serving and made after the fact, therefore, their weight in the analysis is limited. Plaintiff-father's declaration and his wife's refer to the actions they personally took since Plaintiff-son entered the United States. They also affirmatively state that they did not have the intention of adopting Plaintiff-son at the time.

It is up to the fact finder to weigh their credibility and to weigh them against the other evidence in the record. The BIA considered "the entire record" and evaluated the evidence in the declarations. Based on the BIA findings, the declarations did not carry enough weight to surpass the other evidence that suggested adoption was the purpose of bringing Plaintiff-son to the United States.  An agency does not violate the arbitrary and capricious standard where it articulates "a rational relationship between its factual findings and its decision." *Fence Creek Cattle Co.,* 602 F.3d at 1132.

By asking this Court to draw different inferences from those reasonably drawn by the BIA, the Plaintiffs misapprehend the nature of the Court's review. The Court may not substitute its judgment for the reasonable judgment of the BIA, even if this Court may have a different view of the evidence. *See Ponce v. S.E.C.*, 345 F.3d 722, 728 (9th Cir. 2003) ("If ... the evidence is open to more than one interpretation, we are required to uphold the SEC's finding.); *see Gebhart v. S.E.C.*, 595 F.3d 1034, 1043 (9th Cir.2010) (reviewing an agency's factual finding to determine if it was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Because the administrative record reflects a rational basis for the BIA's decision, Defendants are entitled to summary judgment on Plaintiffs' claim that the BIA's decision was arbitrary and capricious and subject to reversal under the APA.

### V.    Conclusion and Order

For the reasons stated above, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiffs' Motion for Summary Judgment. The Clerk is directed to close this case.
IT IS SO ORDERED.

Dated:   **March 1, 2021**                        /s/ *Barbara A. McAuliffe*
UNITED STATES MAGISTRATE JUDGE

25